**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JIMMIE TERRELL (N-11693),** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 3:24 C 50031** |
| | ) | |
| **DR. SY, *et al*.,** | ) | **Hon. Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jimmie Terrell, an unrepresented Illinois prisoner, brought this action under 42 U.S.C. § 1983, claiming that surgery to remove his cataracts was unlawfully delayed in violation of the Eighth Amendment. Terrell attributes the delay to the Defendant, Dr. Larry Sy, who was the Medical Director at Dixon Correctional Center at the time. Dr. Sy has moved for summary judgment [46]. The facts are largely undisputed[1] and, for the reasons explained here, the court

[1] Terrell filed a response to Defendant's LR 56.1 statements of material facts [62]. LR 56.1(e)(3). Terrell's factual responses sometimes do not comply with the Local Rules, *see* LR. 56.1(e)(2), (3), in that they do not cite to the record when disputing Defendant's asserted facts and consist of legal argument or unsupported conclusions. The court will disregard these responses. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions). And where Terrell has not properly responded to a certain fact or has admitted it, the court will accept it as true to the extent supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Nonetheless, although the court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. June 2, 2011), it will generously construe the facts identified by Terrell to the extent they are supported by the record, or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may "construe *pro se* submissions leniently"). The court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus.*, *Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

grants the motion. Dr. Sy did not deny or delay treatment for Mr. Terrell, and there is no basis in this record for a finding that Dr. Sy was deliberately indifferent to Terrell's serious medical need.

## FACTUAL BACKGROUND

### Parties

Plaintiff Jimmie Terrell is an inmate at Dixon Correctional Center ("Dixon"). Def.'s Stmt. Of Facts ("DSMF") [48] ¶ 1. Defendant Dr. Larry Sy is a physician licensed in Illinois who was employed by Wexford Health Sources, Inc. ("Wexford") as Dixon's Medical Director beginning on or about March 9, 2022. DSMF ¶ 2.

As Medical Director, Dr. Sy provided medical care to inmates and participated in collegial review regarding requests for offsite care. DSMF ¶ 3. He referred inmates for offsite care as needed, but did not schedule offsite appointments; scheduling was handled by a staff assistant in the prison's medical writ unit and depended on offsite-provider availability. DSMF ¶¶ 3, 43. Dr. Sy also did not perform onsite eye examinations; such examinations were performed by onsite optometrists. DSMF ¶¶ 3, 23. And when an inmate requires offsite optometry or ophthalmology care, Dr. Sy would review the referral requests from the onsite eye-care specialists and review any recommendations from the offsite specialists. DSMF ¶ 3.

### Terrell's Early Onsite Optometry Care (2019–2020)

As noted, Terrell contends he was denied treatment for cataracts. A cataract is a clouding of the eye's lens and may develop for various reasons, including age, genetics, or trauma. DSMF ¶ 5. Symptoms can include glare, light sensitivity, and halos. DSMF ¶ 5. Cataracts may be simply monitored over time, and surgery may eventually become necessary, depending on the patient's symptoms and the effects that the cataract may have on daily living. DSMF ¶ 5.

The records show that Terrell had numerous contacts with healthcare providers relating to his eyes. On January 23, 2019, while he was housed at Stateville Correctional Center, Terrell underwent an annual eye examination with Dr. Timothy Fahy. DSMF ¶ 6. Dr. Fahy noted early

cataract changes in Terrell's right eye but concluded that surgery was not clinically indicated at that time and planned a 12-month follow-up. DSMF ¶ 6.

In March 2019, Terrell was transferred to Dixon, where he underwent an optometric examination and received new eyeglasses. DSMF ¶ 7. On August 3, 2019, Terrell requested an eye exam and was placed on a waiting list for optometry. DSMF ¶ 8. On January 29, 2020, Terrell complained to a nurse of blurry vision and a cataract in his right eye; the nurse noted no obvious symptoms but placed him on the optometrist's line for evaluation. DSMF ¶ 9. On February 22, 2020, Dr. Fahy examined Terrell at Dixon. DSMF ¶ 10. Dr. Fahy documented "trace NS" (trace nuclear sclerosis) in both eyes but did not find a need for surgery or an offsite referral at that time. DSMF ¶ 10. Dr. Fahy prescribed Ketotifen.[2] DSMF ¶ 10.

On August 5, 2020, Terrell reported eye pain that he rated 4/10 and "a little blurry" vision. DSMF ¶ 11. The nurse who examined him noted a small bump at the inner corner of Terrell's left eye with some discharge, prescribed acetaminophen, and referred Terrell to a provider. DSMF ¶ 11. On August 12, 2020, Dixon optometrist Dr. Peter Popovich evaluated Terrell and assessed a chalazion versus hordeolum (a stye caused by glandular blockage or a backup of oils). DSMF ¶ 12. Dr. Popovich prescribed Keflex and Maxitrol[3] and planned a two-week follow-up. DSMF ¶ 12. At the August 26, 2020 follow-up, the bump persisted, and Dr. Popovich referred Terrell to the University of Illinois at Chicago ("UIC") ophthalmology service. DSMF ¶ 13. Wexford approved the referral on September 9, 2020. DSMF ¶ 13.

---

[2] Ketotifen is an eye drop used to treat eye redness and itching caused by allergies. See https://www.webmd.com/drugs/ketotifen-zaditor-alaway (last visited August 28, 2026).

[3] Keflex (cephalexin) is an antibiotic; Maxitrol is used to treat or prevent eye infections caused by bacteria, and to reduce swelling. *See* https://www.webmd.com/drugs/cephalexin-keflex *and* https://www.webmd.com/drugs/neomycin-polymyxin-b-dexamethasone-ophthalmic-maxitrol (last visited August 28, 2026).

**UIC Evaluation and Continued Onsite Monitoring (2021–mid-2022)**

Care for Mr. Terrell's eyes continued over the next several months. On February 25, 2021, Dr. Popovich assessed Terrell's eyeglasses prescription and noted mild nuclear sclerosis in both eyes, which he planned to monitor. DSMF ¶ 14. Then on June 11, 2021, Terrell was evaluated at UIC by Dr. Emily Cole. DSMF ¶ 15. Dr. Cole noted the examination was within normal limits, found no acute or chronic chalazion, and indicated no further steroid or antibiotics were needed. DSMF ¶ 15. She noted a possible inclusion cyst on his left upper eyelid but did not recommend biopsy at that time and planned a one-year follow-up for observation, which was approved. DSMF ¶ 15; Ex. A [48-1-93].

On July 6, 2021, Terrell complained to a Dixon nurse of a dry, burning sensation in his left eye that arose after the June 11 UIC visit. DSMF ¶ 16. The nurse found no acute distress, noted Terrell declined acetaminophen and ibuprofen, and advised hot compresses, lubricating drops, use of glasses as needed, and hygiene measures. DSMF ¶ 16. Terrell asserts that he was emotionally distressed at the time due to delays in treatment for his eye complaints. Pl.'s Resp. ("PRESP") [62] ¶ 16. When Dr. Popovich followed up with him on July 14, 2021, however, Terrell reported the burning sensation in his left eye had resolved. DSMF ¶ 17; PRESP ¶ 17. Dr. Popovich adjusted the artificial-tears protocol and planned continued monitoring. DSMF ¶ 17. On August 11, 2021, Dr. Popovich checked Terrell's intraocular pressure, which was within normal limits, and planned visual-field testing in six months and a follow-up exam in one year. DSMF ¶ 18.

On October 3, 2021, Terrell complained of eye pain and blurry vision and reported artificial tears were not helping. DSMF ¶ 19. The nurse noted no drainage and normal sclera and referred Terrell to optometry. DSMF ¶ 19. On March 3, 2022, Dr. Popovich again checked Terrell's intraocular pressure, which was within normal limits; Terrell reported no new vision complaints, but his pain and blurry vision persisted, and Dr. Popovich scheduled further visual-field testing

and routine monitoring. DSMF ¶ 20; PRESP ¶ 20. On May 25, 2022, at a routine follow-up, Terrell had no new complaints; intraocular pressures were normal, and Dr. Popovich recommended follow-up in six months. DSMF ¶ 21.

**UIC Annual Exam and Dr. Sy's Review (July–November 2022)**

On July 26, 2022, Terrell was seen at UIC's General Eye Clinic by Drs. Katherine Chen and Joel Sugar for a yearly exam. DSMF ¶ 22. Terrell reported decreased visual acuity over the prior year but denied pain, floaters, flashes, redness, itching, or other symptoms at the time of the appointment. DSMF ¶ 22. The UIC providers noted developing cataracts, with the left more significant than the right, but documented that the cataracts were not affecting Terrell's activities of daily living and that they planned to monitor progression. DSMF ¶ 22.

Dr. Sy became involved in Terrell's care at this time. On July 28, 2022, Dr. Sy reviewed the July 26 UIC findings, approved the recommendations, and provided the information to Dixon's writ office and onsite optometry providers for monitoring and scheduling of further care. DSMF ¶ 23. On August 3, 2022, Dr. Popovich again found intraocular pressures within normal limits; Terrell had no new complaints and was scheduled for continued onsite monitoring. DSMF ¶ 24. On August 12, 2022, Wexford approved onsite visual-field testing. DSMF ¶ 25. On August 24, 2022, Dr. Popovich discussed Terrell's lens prescription; Terrell refused new prescription lenses because he did not want to go without glasses while the lenses were exchanged. DSMF ¶ 26. On August 29, 2022, Wexford approved offsite ophthalmology care at UIC. DSMF ¶ 27. On November 11, 2022, Dr. Popovich again found intraocular pressures within normal limits; Terrell had no new complaints, and Dr. Popovich noted Terrell was being followed by UIC ophthalmology. DSMF ¶ 28.

**Decision for Cataract Surgery and Subsequent Follow-Up (2023–2024)**

On January 27, 2023, Terrell returned to UIC and was seen by Drs. Katharine Chen and Yekaterina Joltikov. DSMF ¶ 29. Terrell reported intermittent floaters in his left eye but denied

pain, flashes, itching, or redness. DSMF ¶ 29. At this point, the UIC providers documented that Terrell's cataracts were visually significant and were affecting his activities of daily living. Ex. [48-2-64]. They noted that Terrell agreed to surgery, and they planned cataract extraction with intraocular lens placement, first in the left eye and then the right. They noted that additional imaging and measurements were required for the surgery and were to be obtained at the next available visit. DSMF ¶ 29. On January 30, 2023, Dr. Sy reviewed and approved these recommendations, namely that Terrell return to UIC at the next available appointment for pre-surgery measurements, and issued a referral. DSMF ¶ 30, Ex. B at Ex. 19.

For reasons that are not clear from the record, what followed was a four-month delay in further treatment. On June 1, 2023, Terrell complained to a Dixon nurse of floaters and cataracts and that the issues had not been resolved sooner. DSMF ¶ 31. The nurse consulted Dr. Popovich, who advised checking visual acuity and comparing it to prior measurements. DSMF ¶ 31. On July 25, 2023, Terrell complained he had not been seen at UIC in "over a year"; presumably he did not remember the January 2023 appointment. DSMF ¶ 32. The nurse contended that Terrell had been seen at UIC in May 2023 but, as Terrell points out, there are no notes of a May 2023 UIC visit in the medical record. DSMF ¶ 32; PRESP ¶ 32. In any event, the next day, on July 26, 2023, a Dixon nurse noted that Terrell had been scheduled by UIC for an appointment in October 2023. DSMF ¶ 33.

On August 2, 2023, Dr. Sy received a letter from Terrell complaining of worsening vision and occasional eye pain. DSMF ¶ 34. Dr. Sy reviewed Terrell's chart and consulted with Dr. Popovich, who agreed to see Terrell "urgently." DSMF ¶ 34. When Dr. Popovich evaluated Terrell on August 9, 2023, Terrell reported constant blurred vision in the left eye beginning three months earlier and described an acute change noticed one morning. DSMF ¶ 35. Dr. Popovich assessed a hypermature cataract in the left eye and submitted a referral for UIC evaluation and management, including possible removal of the cataract. DSMF ¶ 35.

UIC records reflect that Terrell was marked as a "no show" for an October 26, 2023 appointment that had been scheduled. DSMF ¶ 36. The reason for the reported non-appearance is not clear. But two months later, on January 10, 2024, Dr. Sy contacted Dixon's writ office to have Terrell scheduled at UIC's General Eye Clinic and planned to follow up with Terrell in one month regarding scheduling updates. DSMF ¶ 36. On February 13, 2024, Dr. Sy met with Terrell and advised him that UIC had scheduled him for an appointment. DSMF ¶ 37.

On April 10, 2024, Terrell returned to UIC and was seen by Drs. Paul Parker and Elmer Tu, who recommended planning left-eye cataract surgery in July or August 2024. DSMF ¶ 38. On April 25, 2024, Wexford approved cataract surgery at UIC. DSMF ¶ 39. On July 25, 2024, Terrell underwent left-eye cataract surgery at UIC (phacoemulsification with intraocular lens insertion), which was completed without complication. DSMF ¶ 40. Terrell's post-surgical recommendations were approved by Dr. Sy or another Dixon medical staff member. DSMF ¶ 40.

## **ANALYSIS**

Terrell contends this record establishes that Dr. Sy was deliberately indifferent to his serious medical need for cataract surgery, in violation of the Eighth Amendment. The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (citations and quotation marks omitted). To prevail on a claim that his medical care violated the Eighth Amendment, a prisoner must be able to prove that: (1) he suffered from an objectively serious medical condition and (2) the defendant knew about and was deliberately indifferent to the condition. *See id.* (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). In determining whether Dr. Sy is entitled to summary judgment on this claim, the court must determine whether the evidence, viewed in the light most favorable to Mr. Terrell, establishes that there are no disputes of material fact and that Dr. Sy is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id*. at 159–60.

In this case, Dr. Sy concedes that Terrell's cataracts constituted a serious medical condition, at least once surgery was indicated. This case is about the second element: deliberate indifference. To prove deliberate indifference, "a plaintiff must establish that [the] official knows of and disregards an excessive risk to inmate health or safety or that the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations and citations omitted). Establishing deliberate indifference "requires a showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (cleaned up).

Terrell's claim of deliberate indifference is about the amount of time it took for his cataract surgery to occur. The specific time period in question is approximately one and a half years: from January 2023—when UIC eye specialists concluded that surgery was indicated[4]—to July 2024, when they performed the surgery.

One "type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (reh'g en banc). Still, not every delay in a prisoner's medical treatment gives rise to a constitutional claim. *See Clemons v. Wexford Health Sources, Inc.,* 106 F.4th 628, 636 (7th Cir. 2024) ("delay alone is not enough" (internal quotations and citations omitted)). Even outside of the prison setting, patients often must wait weeks or months for

---

[4] At Terrell's prior UIC appointment, in July 2022, the treaters recommended only continued monitoring of the cataracts. As noted, Dr. Sy did not become Dixon's Medical Director until March 2022 and does not appear to have been involved in Terrell's care prior thereto. DSMF ¶ 2.

specialist appointments. "Whether delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022). "[E]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Id.* (quoting *Rasho*, 22 F.4th at 710).

Terrell contends that the time lapse here was unlawful, and that Dr. Sy acted with deliberate indifference because he failed to ensure that the surgery take place sooner. As Dr. Sy points out, however, he was not responsible for, nor involved in, the scheduling of Terrell's UIC appointments. It is axiomatic that personal involvement in an alleged constitutional violation is a necessary condition for liability under Section 1983. It follows that here Terrell must show that the Dr. Sy's "actions or inaction caused the delay in his treatment," and that the court "can only hold [Dr. Sy] liable if he had control over the circumstances that caused the delays." *Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 964, 966 (7th Cir. 2019).

Dr. Sy's testimony is unrebutted that staff in the writ office were responsible for scheduling approved outside appointments, and that this scheduling is subject to the outside treaters' own availability—which is not within Dr. Sy's control. It is also undisputed that when Terrell returned from his January 27, 2023 UIC appointment, Dr. Sy immediately approved UIC's plan and issued the necessary referral for Terrell to return at the next available appointment for pre-surgery measurements. Indeed, there is no instance in the record of Dr. Sy ever refusing to refer Terrell for offsite eyecare at UIC. Nothing in the record suggests that, after making the referral, Dr. Sy had responsibility for or control over the timing or scheduling of the pre-surgery appointments and the surgery itself. As a result, Terrell cannot show that Dr. Sy's actions or inactions with respect to that scheduling constituted deliberate indifference. *See Walker*, 940 F.3d at 965 (holding that prison physician was not deliberately indifferent as a result of failing to ensure that prisoner received treatment within a timeline requested by outside specialists, where physician was not

involved in the outside hospital's scheduling process); *Wells v. Dominguez*, No. 3:17-cv-50087, 2022 WL 17718421, at *6 (N.D. Ill. Dec. 15, 2022) (explaining that defendant can be held liable for delays in scheduling only if evidence shows defendant had control over the circumstances that caused delays).

As described above, Terrell was marked as a "no show" for his October 2023 pre-surgery appointment. The record does not explain this, and there is no basis to conclude that Terrell himself was at fault. But there is also no basis for finding that Dr. Sy, who was not involved in scheduling of those outside appointments, was in some way responsible for the no-show. Terrell contends that, as Dixon's Medical Director, Dr. Sy was responsible for ensuring that the writ team does its job properly. He cites to a "Policy and Procedure Manual" that is not a part of the record. PRESP ¶ 36. But assuming that policies were violated in this case, Dr. Sy cannot be held liable for the violations, as there is no vicarious liability under Section 1983. *Bostic v. Murray*, 160 F.4th 831, 840 (7th Cir. 2025) (explaining that, under Section 1983, "a supervisor is liable for money damages only for his . . . own misconduct"); *Adams v. Cook Cnty. Dep't of Corr.*, 485 F.Supp.2d 940, 943–44 (N.D. Ill. 2007) (prison medical director may not be sued in purely his supervisory role); *see also Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (explaining that Section 1983 provides a remedy for constitutional violations, not violations of state law or departmental regulations). In similar circumstances, courts have concluded that prison medical professionals are not liable for a breakdown in a scheduling function over which they had no involvement. *See Turner v. Paul*, 953 F.3d 1011, 1016 (7th Cir. 2020) (concluding that defendant physicians could not be held liable for failing to "nag" the individuals responsible for scheduling outside appointments: "We are aware of no rule of law that would impose a duty on the medical defendants to continue calling the clinic, after they had properly contacted the proper schedulers"); *Newell v. Ngu*, 589 F. App'x 782, 787 (7th Cir. Oct. 20, 2014) (affirming summary judgment for medical director on claim that he should be held liable for nurses' delays in attending

to prisoner's catheter where medical director had no control or direct oversight over those missed nursing visits).

This record does not support the notion that Dr. Sy ever consciously disregarded Terrell's needs. To the contrary, when, beginning in July 2023, Terrell expressed frustration at the pace of his outside treatment, the prison's medical staff, including specifically Dr. Sy, investigated and responded with attentiveness to his complaints of delay. Nursing staff investigated Terrell's first complaint on July 25, 2023 and noted the next day, July 26, 2023, that Terrell's pre-surgery UIC appointment had been set for October 2023. Shortly thereafter, on August 2, 2023, Dr. Sy responded to Terrell's letter complaining of persistent cataract symptoms by reviewing Terrell's chart and referring him "urgently" to Dr. Popovich. Dr. Popovich examined Terrell and noted the same cataract symptoms persisting. Dr. Popovich did not assess Terrell's situation as urgent or an emergency, but he issued another referral for UIC. By that time, a UIC appointment had already been scheduled for October 2023—the appointment that, for unclear reasons, did not happen. But it was Dr. Sy who, in January 2024, personally contacted Dixon's writ office to have Terrell scheduled at UIC. He then met with Terrell one month later, in February 2024, to advise him that UIC had scheduled him for an appointment. From there Terrell had the necessary pre-surgery appointment in April 2024 and the surgery itself in July 2024—based on UIC's recommended timeline and availability. The surgery was successful.

Surely prompter treatment is always most desirable. But this record confirms that Dr. Sy made reasonable efforts within the limits of his role to move the ball forward with the UIC surgery, and those efforts were ultimately successful. This is the antithesis of deliberate indifference. *See, e.g.*, *Walker*, 940 F.3d at 965 (noting that the prison physician "made referrals and re-referrals when necessary, all while treating [the plaintiff's] symptoms" and that such "treatment was not outside the bounds of medical professionalism"); *Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985, 996–97 (N.D. Ill. 2015) (finding that "in the light of an existing treatment plan by the

specialists who had assumed responsibility for plaintiff's surgery," prison physician who exercised medical judgment while treating prisoner in the interim was not "deliberately indifferent by failing to actively disrupt" specialists' treatment plan); *Redman v. Doehling*, 751 F. App'x 900, 903–04 (7th Cir. Sep. 26, 2018) (concluding that nurse who referred prisoner for an exam, but was not responsible for scheduling appointments or transportation, and who made another referral upon learning that the exam had not taken place, was not deliberately indifferent).

**Claims Against Dr. Fahy**

The court addresses one final matter. Plaintiff's original complaint [10], also named a "John Doe optometrist", and the court's screening order under 28 U.S.C. § 1915A found that Terrell had stated a claim against this John Doe optometrist; the court therefore instructed Terrell to identify and name him in an amended complaint if he wanted to proceed against him in this action [9]. Terrell later filed what he deemed an "amended complaint" [13] identifying the John Doe optometrist as Dr. Fahy. Due to an oversight, the court did not address this filing at the time, and Dr. Fahy was never served and brought into this case. Terrell himself did not again raise the issue.[5]

The court notes, further, however, that Terrell's one allegation about Dr. Fahy in the later submission [13] was that in 2020 he twice examined Terrell's eyes and assessed cataracts, but declined at those times to refer him to an outside specialist. Indeed, as reflected in the summary

---

[5] The court notes for the sake of completeness that Terrell's filing [13] was not a proper amended complaint; rather, Terrell used the court's amended complaint form to inform the court that he had identified Dr. Fahy by name, but Terrell did not include any of his allegations or claims against Dr. Sy in that filing. An amended complaint ordinarily supersedes the original complaint and renders the original complaint void, *see Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004), yet Terrell's central claim here is the one raised in his original complaint: that Dr. Sy was deliberately indifferent to his serious medical need, the claim he has continued to press in this case.

judgment record, Dr. Fahy examined Terrell once in 2019 and once in 2020 and both times determined that an outside referral to treat his early-stage cataracts was not necessary at those times. But, as the record also shows, Terrell did see UIC specialists multiple times from June 2021 through June 2022, upon Dr. Popovich's referral, and even at those later dates, the UIC physicians' recommendation for treatment for Terrell's cataracts was nothing more than continued monitoring. To support a claim that Dr. Fahy impermissibly delayed in referring him to a specialist, Terrell would need verifying medical evidence, such as medical records, that the delays in a referral, rather than the underlying conditions, caused him harm. *See McMillen v. Wexford Health Sources, Inc.*, No. 23-1836, 2025 WL 2543981, at *2 (7th Cir. Sept. 4, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 680 (7th Cir. 2023).

He cannot possibly make such a showing, as outside specialists continued to recommend merely monitoring of the cataracts all the way up through July 2022. Terrell's central claim here is that surgery was delayed from the amount of time it took for his cataract surgery—from January 2023 (years after Dr. Fahy last treated him), when UIC specialists concluded that surgery was necessary, to July 2024, when the surgery took place. The summary judgment record confirms that there is no basis for a finding of deliberate indifference on the part of Dr. Fahy.

## CONCLUSION

Defendant Dr. Sy is entitled to summary judgment for the reasons discussed above. His motion for summary judgment [46] is granted. The court dismisses claims against Dr. Fahy. Final judgment will be entered in Defendants' favor. This case is closed.

ENTER:

Date: September 2, 2026

REBECCA R. PALLMEYER
United States District Judge